TRIAD INTERNATIONAL
MAINTENANCE CORPORATION,
Plaintiff,

v.

GUERNSEY AIR LEASING, LTD., and
Translux International Airlines
S.A., Defendants.

No. 1:00CV00965.

United States District Court,
M.D. North Carolina.

Aug. 7, 2001.

Kenneth Paul Carlson, Jr., Edwards Ballard Clark Barrett and Carlson, P.A., Winston-Salem, NC, Michael J. Simons, Austin, TX, for plaintiff.

Paul K. Sun, Jr., Ellis & Winters, LLP, Raleigh, NC, Thomas R. Port, Danville, CA, for defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

Plaintiff Triad International Maintenance Corporation ("TIMCO") operates an aircraft maintenance facility at the Triad International Airport in Greensboro, North Carolina. In February 2000, TIMCO, pursuant to a contract between it, Guernsey Air Leasing, Ltd ("Guernsey"), and Translux International Airlines S.A. ("Translux"), began performing aircraft maintenance services on a McDonnell Douglas DC–8–62F aircraft, serial number 45960 ("the Aircraft"). The Aircraft is owned by Defendant Guernsey Air Leasing, Ltd. ("Guernsey") and has been under lease to Defendant Translux International

Airlines S.A. ("Translux"). Guernsey and Translux are both foreign corporations headquartered overseas, with their principal addresses being in Guernsey, the Channel Islands, and the Grand Duchy of Luxembourg, respectively.

Guernsey and Translux (collectively known as "Defendants"), in February 2000, delivered the Aircraft to TIMCO's Greensboro facility for "C" check aircraft maintenance services,[1] and for services related to a required corrosion prevention and control program ("CPCP"). After the Aircraft arrived in Greensboro, TIMCO inspected it and later discovered that the Aircraft failed to meet the airworthiness standards of American and European regulatory agencies. TIMCO also discovered that extensive additional work was needed to return the Aircraft to an operational state. Before performing work on the Aircraft outside of those services that were a normal part of the "C" check and CPCP program, TIMCO received written approval from experienced representatives of Defendants who were on-site at the Greensboro facility.

During the time that various services were being performed on the Aircraft, Defendants requested that TIMCO remove two of the Aircraft's four engines, so that Defendants could utilize the engines on other aircraft. Thereafter, TIMCO relinquished possession of the engines and shipped them to Defendants, on or about March 14, 2000.

By mid-April 2000, TIMCO contends that it had performed approximately $4.5 million in services upon the Aircraft. However, other than an initial input payment of approximately $250,000, from which TIMCO could draw as payment for beginning work, Defendants, to date, have not paid any portion of TIMCO's bill for the services rendered.[2] In light of this fact, on April 17, 2000, TIMCO ceased its repair work on the Aircraft, and from that point forward, limited its work thereon only to those projects whose man hours had been approved and to those services necessary to protect and adequately secure the Aircraft during storage. This work continued until at least April 27, 2000, at which point, TIMCO received an email from Robin Giesbrecht, Guernsey's Director of Maintenance. The email instructed TIMCO to "stop work" under the Agreement. After that point, TIMCO only performed services related to storage and preservation of the Aircraft, such as installing the landing gear, installing protective covers for the Aircraft openings, and treating the Aircraft with protective coatings to secure it for storage. Services of this type were performed through mid-May 2000, with ongoing preservation measures essentially continuing through the present. Although the Aircraft is currently secured from the elements to help minimize the possibility of deterioration, it is not yet airworthy or in flying condition. To date, TIMCO alleges that the total amount of charges owing to it by Defendants for services that have been completed is $4,453,290.73 in United States currency, plus any accrued interest, late charges, and storage fees.

Since the April 2000 work stoppage, the parties have attempted, on various occasions, to reach a satisfactory resolution concerning the Aircraft. However, to date, those efforts have not succeeded. In light of the parties' inability to reach a

---

1. "C" check is a term that is used by the industry for a moderately comprehensive aircraft overhaul.

2. Defendants' failure to compensate TIMCO for its services provided the basis for TIMCO's underlying claim against Defendants, which is still pending before this Court.

mutually acceptable resolution, and in order for TIMCO to protect its possessory lien on the Aircraft, on July 28, 2000, TIMCO notified Defendants and Anglo Irish Bank ("AIB"), through its Motion for Judicial Hearing Prior to Lien Sale, and for Order to Conduct Sale [Document # 8] and through the documents accompanying the motion, that it held a possessory lien in the Aircraft, pursuant to N.C. Gen.Stat. § 44A–1 *et seq.* (Verified Compl.—Ex. B.)[3] Also in TIMCO's motion and accompanying documents, TIMCO notified Defendants and AIB that it sought, as part of its motion, the return of two engines ("the Engines") that had been detached from the Aircraft and delivered to Defendants, so that said engines could be reattached to the Aircraft prior to the requested sale. In addition, TIMCO informed AIB that it sought the complete set of records for the Aircraft ("the Records"), including all documents related to the Aircraft's maintenance and operational history. According

---

**3.** Pursuant to N.C. Gen.Stat. § 44A–2,

Any person who tows, alters, repairs, stores, services, treats, or improves personal property other than a motor vehicle in the ordinary course of his business pursuant to an express or implied contract with an owner or legal possessor of the personal property *has a lien upon the property* [hereinafter, such a lien will be referred to as a "mechanic's lien"]. The amount of the [mechanic's] lien shall be the lesser of

(1) The reasonable charges for the services and materials; or

(2) The contract price; or

(3) One hundred dollars ($100.00) if the lienor has dealt with a legal possessor who is not an owner.

*This lien shall have priority over perfected and unperfected security interests.*

N.C. Gen.Stat. § 44A–2 (emphasis added). Section 44A–3 then provides that mechanic's liens only arise "when the lienor *acquires possession of the property* and *terminate and become unenforceable when the lienor voluntarily relinquishes the possession* of the property upon" which the mechanic's lien is claimed, "or when an owner, his agent, a legal possessor or any other person having a security or other interest in the property tenders prior to sale the amount secured by the lien plus reasonable storage, boarding and other expenses incurred by the lienor". N.C. Gen.Stat. § 44A–3 (emphasis added).

Finally, section 44A–4 provides as follows: (a) Enforcement by Sale.—If the charges for which the lien is claimed under this Article *remain unpaid or unsatisfied for 30 days or, in the case of towing and storage charges on a motor vehicle, 10 days following the maturity of the obligation to pay any such charges, the lienor may enforce the lien by public or private sale* .... *Failure of the* lienor to bring such action within a 180–day period following the commencement of storage shall constitute a waiver of any right to collect storage charges which accrue after such period....

(b)(2) If the property upon which the lien is claimed is [an aircraft], the lienor *following the expiration of the 30–day period provided by subsection (a) shall issue notice to the person having legal title to the property, if reasonably ascertainable* .... The notice shall inform the recipient that the recipient has the right to a judicial hearing at which time a determination will be made as to the validity of the lien prior to a sale taking place. The notice shall further state that the recipient has a period of 10 days from the date of receipt in which to notify the lienor by registered or certified mail, return receipt requested, that a hearing is desired and that if the recipient wishes to contest the sale of his property pursuant to such lien, the recipient should notify the lienor that a hearing is desired.... *Failure of the recipient to notify the lienor within 10 days of the receipt of such notice that a hearing is desired shall be deemed a waiver of the right to a hearing prior to sale of the property against which the lien is asserted and the lienor may proceed to enforce the lien by public or private sale as provided in this section. If the lienor is notified within the 10–day period provided above that a hearing is desired prior to sale, the lien may be enforced by sale as provided in this section only pursuant to the order of a court of competent jurisdiction.*

N.C. Gen.Stat. § 44A–4 (emphasis added). AIB concedes that TIMCO has met Chapter 44's requirements for establishing priority under North Carolina law.

to TIMCO, such documents are "critical to TIMCO being able to certify [the Aircraft's] maintenance and operational history for regulatory and other purposes, and to TIMCO's ability to sell such aircraft at fair market value pursuant to N.C. Gen. Stat. § 44A–1 *et seq* . . . ."

Although Defendants did not request a hearing or contest TIMCO's enforcement of its possessory lien in the manner or time period required by N.C. Gen.Stat. § 44A–4(b)(2), *see supra* note 3, AIB, another "owner" for purposes of the statute, objected to TIMCO's Motion for Judicial Hearing Prior to Lien Sale, and for Order to Conduct Sale ("TIMCO's Motion"), because AIB holds an interest in the Aircraft pursuant to the following transactions: (1) a Loan Agreement, dated November 11, 1998, between Guernsey, Castweld Investments Limited, Translux International Airlines SA, and AIB, as amended October 26, 2000; (2) a Deed of Mortgage between Guernsey and AIB, dated November 27, 1998, which was properly registered in the Luxembourg Bureau des Hypotheques; (3) a Second Deed of Mortgage, dated August 2, 1999, which is also recorded in the Luxembourg Bureau des Hypotheques; and (4) a Head Lease Security Assignment between Guernsey and AIB, dated November 17, 1998, and properly recorded in the Company's Registration Office in Ireland.[4]

In light of AIB's objections, the Court held a hearing on June 26, 2001, in accordance with the requirements of N.C. Gen. Stat. § 44A–4(b)(2), *see supra* note 3, to determine the validity and scope of the TIMCO lien, to determine what, if anything, TIMCO is entitled to, and to ascertain TIMCO's authority to conduct a sale.[5] At the hearing and in AIB's Response to TIMCO's Motion,[6] AIB first alleged that TIMCO relinquished all interests that it held in the Aircraft's engines, to the extent that it returned said engines to Defendants. AIB next alleged that TIMCO is not entitled to the Records related to the Aircraft because it never had possession or a mechanic's lien with respect to those items. Finally, AIB alleged that the Convention on International Recognition of Rights in Aircraft ("the Treaty"), a multilateral treaty to which both the United States and Luxembourg are signatories, and which governs property rights in aircraft, gives it a superior priority interest in the Aircraft. For that reason, AIB alleged that the Court should deny TIMCO's motion for an order to conduct a sale. Alternatively, AIB contended that because it holds the senior interest in this case, if the Court does order a sale, the proceeds from the sale should be turned over to AIB in the amount of its secured interest.

Because TIMCO was unable to sufficiently address the merits of AIB's Treaty argument at the hearing and because of the late manner in which AIB's Response was filed, the Court allowed TIMCO to file a reply to AIB's assertions. In its Reply, TIMCO asserted the following alternative positions: (1) the Engines and the Records, though not in TIMCO's possession, should be turned over to it to allow it to

---

4. Under the Loan Agreements, AIB has a mortgage in the Aircraft and in four Pratt & Whitney type JT32D–7 engines, and three Pratt & Whitney type JT3D–7 replacement engines.

5. Because Defendants failed to object within ten (10) days, as required by N.C. Gen.Stat. § 44A–4(b)(2), *see supra* note 3, Defendants waived their right to a hearing and were not permitted to be heard at the hearing, although a representative for Defendants was present.

6. AIB did not file its Response until June 22, 2001, approximately three months after TIMCO notified AIB of its intent to enforce its lien.

recoup the fair market value of the Aircraft at a judicially ordered sale; (2) the Treaty does not control the issue of priority in this case, because, pursuant to the Agreement entered into between TIMCO and Defendants, North Carolina law and United States law govern all issues and transactions arising out of the Agreement; (3) TIMCO has met the Treaty's requirements for establishing a priority interest; and (4) AIB's objections to its possessory lien were untimely in this case, to the extent that it filed its Response three months after TIMCO's own motion was filed. Each of TIMCO's assertions with respect to the Aircraft is next addressed by the Court in turn. The Court will then turn to the issue of whether the Engines and the Records should be returned to TIMCO, for the purpose of conducting a sale and whether AIB's Reply should be disregarded by the Court under the circumstances of this case.

## I. DISCUSSION

### A. Choice of Law Provision

■ TIMCO first asserts that the terms of its contract (the "Agreement") with Defendants control the issue of priority in this case. TIMCO bases this assertion on the fact that the Agreement provides that "[it] shall be governed by, construed and enforced in accordance with the laws of the State of North Carolina and the United States of America ...." Given this language, TIMCO contends that North Carolina law controls the issue of priority as between it and AIB.[7] However, as AIB asserts, to the extent that the Treaty conflicts with North Carolina law, and to the extent

that AIB was a non-party to the Agreement, the Treaty controls the issue of priority in this case. Specifically, "[i]t is a fundamental principle of contract law that parties to a contract may bind only themselves and ... may not bind a third person who is not a party to the contract in absence of his consent to be bound." *Nationwide Mutual Insurance Co. v. Chantos*, 293 N.C. 431, 438, 238 S.E.2d 597, 602–03 (1977) (citations omitted). Given that AIB was not a party to the contract between TIMCO and Defendants, TIMCO's assertion that AIB is bound by the choice of law provisions set forth in the Agreement is without merit. For all of the foregoing reasons, the Court finds that the Treaty controls the determination of the issue of priority in this case. In light of this conclusion, the Court next turns to the terms of the Treaty.

### B. The Treaty

■ AIB first asserts that it holds an interest in the Aircraft superior to TIMCO's, pursuant to Article I of the Treaty, which sets forth the general rule with respect to priority interests where international transactions are involved. *See* Convention on the International Recognition of Rights in Aircraft, June 19, 1948, art. 1, 4 U.S.T. 1830. Specifically, Article I of the Treaty provides as follows:

(1) The Contracting States undertake to recognise: (a) rights of property in aircraft; (b) rights to acquire aircraft by purchase coupled with possession of the aircraft; [and] (d) mortgages, hypotheques and similar rights in aircraft which are contractually created as security for payment of an indebtedness;

---

**7.** To the extent that North Carolina law affords priority to mechanic's liens over all other perfected and unperfected security interests, if the Court were to conclude, as TIMCO suggests, that a sale should be allowed in this case, then, pursuant to North Carolina law, TIMCO's mechanic's lien would predominate over all other interests in the Aircraft, *see supra* note 3.

provided that such rights (i) have been constituted in accordance with the law of the Contracting State in which the aircraft was registered as to nationality at the time of their constitution, and (ii) are regularly recorded in a public record of the Contracting State in which the aircraft is registered as to nationality....

(2) Nothing in this Convention shall prevent the recognition of any rights in aircraft under the law of any Contracting State; but Contracting States shall not admit or recognize any right as taking priority over the rights mentioned in paragraph (1) of this Article.

The Treaty, art. 1, 4 U.S.T. 1830. In light of the Treaty's express language, any interest in an aircraft that has been regularly recorded in the public record of the Contracting State in which the aircraft is registered takes a priority over *all other interests* in the aircraft, that must be recognized by all Contracting States, regardless of domestic law. *See id.* In the present case, AIB properly recorded its security interest in the Aircraft in Germany, the Contracting State in which the Aircraft is registered. For that reason, AIB has met Article I's requirements for priority. However, such a conclusion does not end the Court's inquiry as to the issue of priority, given that Article IV of the Treaty carves out an exception to the Article I general rule, which provides as follows:

(1) In the event that any claims in respect of: (a) compensation due for salvage of the aircraft, or (b) extraordinary expenses indispensable for the preservation of the aircraft give rise, under the law of the Contracting State where the operations of salvage or preservation were terminated, to a right conferring a charge against the aircraft, such right shall be recognized by Contracting

States and shall take priority over all other rights in the aircraft....

(3) Any of said rights may, within three months from the date of the termination of the salvage or preservation operations, be noted on the record.

(4) the said rights shall not be recognized in other Contracting States after expiration of the three months mentioned in paragraph (3) unless, within this period, (a) the right has been noted on the record in conformity with paragraph (3), and (b) the amount has been agreed upon or judicial action on the right has been commenced....

The Treaty, art. 4, 4 U.S.T. 1830. Given the provisions of Article IV, a party asserting rights in an aircraft has superior rights in that aircraft over all other interest holders, despite the general provisions of Article I, where each of the following requirements have been met: (1) the party incurred *extraordinary expenses* necessary for the aircraft's preservation; (2) the party's rights in the aircraft have been properly *noted on the record* within three months of the termination of the preservation operations ("the relevant period"); and (3) the amount owed for said expenses has been *agreed upon or judicial action as to the same was commenced* within the relevant period. *See id.* TIMCO contends that it has met each of these requirements, and, thus, holds the priority interest in the Aircraft over AIB. Each of Article IV's requirements, as it pertains to the facts of this case, is next addressed in turn.

## 1. Extraordinary Expenses

 TIMCO first asserts that it has met the Article IV requirement of incurring extraordinary expenses for the preservation of the Aircraft, to the extent that it performed a variety of services indispensable both to restoring the Aircraft to operable condition and to preparing the

Aircraft for proper storage. More particularly, TIMCO alleges that it performed the following services with respect to the Aircraft in satisfaction of Article IV's extraordinary repair requirements: (a) replaced the right longeron 24; (b) replaced the left main landing gear attach fitting; (c) replaced pylon conduits; (d) fabricated numerous structural components required to make the Aircraft airworthy; (e) overhauled all of the engine cowlings and most of the composite panels and flight controls; (f) performed numerous structural repairs to the Aircraft's skin and primary structural components due to extensive corrosion; (g) installed the landing gear, installed protective covers for aircraft openings, and treated the Aircraft with protective coverings to secure it for storage. (Schroeder Aff. ¶¶ 4, 5.) As to whether such services qualify as "extraordinary" for purposes of determining priority, case law construing this term has not been fully developed. However, an annotated text providing some guidance on this issue was prepared by the Legal Subcommittee of the Air Coordinating Committee responsible for drafting the Convention. *See Journal of Air Law and Commerce*, annotated text, 4 U.S.T. 1830 (1953). Because a court's primary goal in treaty interpretation is to give effect to the intent of the drafters, to the extent that the annotated text was drafted by a subcommittee of the drafters of the Convention, the Court affords great deference to this text. *See, e.g., Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217, 226, 116 S.Ct. 629, 634, 133 L.Ed.2d 596 (1996) ("Because a treaty ratified by the United States is not only the law of this land, see U.S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history and the *postratification understanding of the contracting parties*.") (emphasis added); *Ross*

*v. McIntyre (In re Ross)*, 140 U.S. 453, 475, 11 S.Ct. 897, 35 L.Ed. 581 (1891) ("It is a canon of interpretation to so construe a . . . treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances. . . . The inquiry in all such cases is as to what was intended . . . in the treaty by the contracting parties."). The annotated text to the Treaty provides as follows:

> The word "extraordinary" was inserted [in Article IV] to indicate that ordinary, routine expenditures were not intended to be covered by this clause. Only those expenses which are out of the ordinary and are not recurring are intended to be covered. . . . The word "preservation" was used to indicate that the expenses must be necessary for the maintenance of the aircraft in the condition in which it was prior to the time the expenses were incurred. It does not include any expenses which add to or increase the value of the aircraft, and therefore would not include repairs. *See Minutes, Legal Commission, 2nd Assembly, ICAO Doc. 5722, p. 186, 187, 188.*

*Journal of Air Law and Commerce*, annotated text, 4 U.S.T. 1830, Art. IV(1)(b), nn. 43–44. Given this language, even under the Legal Subcommittee's narrow interpretation of the term "extraordinary", the Court finds that, because many of the services that TIMCO performed for Defendants were aimed at returning the Aircraft to an operable state and at securing the same for storage, TIMCO has met Article IV's "extraordinary repairs" requirement. For the foregoing reasons, the Court next turns to whether TIMCO's possessory interest was properly noted on the record, the second element that must be proven by TIMCO to establish Article IV priority in this case.

### 2. Noted on the Record

■ Pursuant to the Treaty, a priority interest asserted under Article IV must be "noted on the record" within three months of the relevant period. The Treaty, June 19, 1948, art. 4, 4 U.S.T. 1830. The statute, itself, does not expressly indicate what a party must do to have its right in an aircraft "noted on the record." *See id.* Again, although the Court has discovered no reported opinions interpreting this language, the Court affords great deference to the interpretation given to the phrase by the drafters of the Convention. *See, e.g., Ross,* 140 U.S. at 475, 11 S.Ct. 897. According to the Legal Subcommittee, the term "noted on the record" is "regarded as constituting a specific direction to the Administrator of Civil Aeronautics to place any claim of such rights in the appropriate aircraft file maintained by him and to take such other action as may be necessary to implement this provision." *Journal of Air Law and Commerce,* annotated text, 4 U.S.T. 1830, Art. IV(3) n. 51. In this case, although TIMCO arguably took other actions, within the relevant period, aimed at giving notice to AIB, TIMCO has neither asserted nor presented evidence that a claim of its rights has been placed in the appropriate aircraft file maintained by the Administrator of Civil Aeronautics. As previously noted, the goal of Treaty interpretation and application is to effectuate the intent and purposes of the drafters. *See In re Ross,* 140 U.S. at 475, 11 S.Ct. 897. Therefore, even though the facts of this case suggest that AIB was notified of TIMCO's interest in the Aircraft through TIMCO's motion and accompanying notice, the notice provided by TIMCO was insufficient to establish priority in this case, to the extent that the notice was not given in the manner contemplated by the drafters. To conclude otherwise would contradict one of the purposes of the Treaty, which is to ensure the uniform application and protection of priority interests in aircraft by all Contracting States. *See, e.g., Journal of Air Law and Commerce,* annotated text, 4 U.S.T. 1830, Art. IV(5) n. 58 (explaining the manner in which terms in the Treaty should be interpreted to guarantee uniformity among Contracting States). For the foregoing reasons, TIMCO has not technically met all of the conditions that would extend to it a superior interest over AIB pursuant to the exception set forth in Article IV.

### 3. Judicial Action and Agreement as to the Amount of Expenses Incurred

To the extent that failure to meet any of Article IV's requirements precludes TIMCO from establishing a cognizable priority interest under the Treaty, the Court need not address the Treaty's third requirement, that is, whether TIMCO commenced judicial action within the relevant period or established that the amount of expenses owing has been agreed upon. Therefore, pursuant to Article I, AIB holds a senior interest in the Aircraft to that of TIMCO's interest, which was established pursuant to North Carolina law.

As to the issue of whether the Court will grant TIMCO's motion to order a sale, there is no provision within N.C. Gen.Stat. § 44A–2 *et seq.* that prevents the Court from ordering a sale, despite its ruling with respect to priority under the Treaty. However, the Court will delay ruling on the issue of whether a sale should be ordered, to the extent that when TIMCO initially requested such an order, it relied solely on what it perceived as a priority interest assigned to it pursuant to North Carolina law. This position, however, failed to take into account the Treaty's terms with respect to priority of the liens, as raised by AIB. Given the inapplicability of North Carolina law as to priority under the circumstances of this case, the Court is

unable to determine, at this point, whether TIMCO wishes to proceed with the sale. For the foregoing reasons, the Court will permit TIMCO a period of ten (10) days within which to notify the Court of its present position with respect to its desire for a judicially ordered sale. It should be noted, however, that if TIMCO wishes to proceed with the sale, that portion of any sale proceeds necessary to first fulfill AIB's secured interest will be placed in a constructive trust after the sale. TIMCO's interest will then be protected, to the extent that there are remaining proceeds from the sale.

### C. The Engines and Records

TIMCO also asserts as part of its Motion that the Engines and the Records should be turned over to it, as to not impair its ability to recover the fair market value of the Aircraft at sale. However, though Plaintiff asserts rights in the aforementioned items, to the extent that the availability of these items is critical to a reasonable value being recouped for the Aircraft upon its sale, Section 44A–3 does not provide the relief TIMCO is seeking. More particularly, pursuant to N.C. Gen. Stat. § 44A–3, mechanic's liens only arise "when the lienor acquires possession of the property" in which the interest is claimed. The statute then provides that such liens "terminate and become unenforceable when the lienor *voluntarily relinquishes the possession* of the property upon" which the mechanic's lien is based. N.C. Gen. Stat. § 44A–3. In this case, TIMCO never acquired possession of the Records. Therefore, given the language of Section 44A–3, it never acquired a mechanic's lien as to those items and is not entitled to

them, even though the Engines and the Records would enhance the sale value of the Aircraft.

Moreover, with respect to the Engines, although TIMCO had acquired possession thereof, it voluntarily relinquished the same at Defendants' request. As Section 44A–3 instructs, when TIMCO returned the Engines to Defendants, TIMCO's interest in the Engines terminated and it no longer held an enforceable interest as to the Engines. For all of the foregoing reasons, to the extent that TIMCO requests that the Engines and the Records be returned to its possession in light of the requested sale, TIMCO's motion is DENIED.[8]

### D. Untimeliness of AIB's Response

As a final matter, the Court notes that TIMCO has reasserted its objection to the untimeliness of AIB's Response in this case. According to TIMCO, AIB's Response should be disregarded to the extent that it failed to comply with the filing requirements of Local Rule 7.3(f). Specifically, Local Rule 7.3(f) allows a party a 20-day period within which to respond to a motion. As previously noted, AIB waited a period of approximately three months to file its Response. However, to the extent that AIB made the same arguments at the hearing that it made in its Response, the Court finds that no prejudice has resulted from the Court's consideration of the Response. All parties agree that AIB was permitted to appear and be heard at the hearing. In addition, TIMCO was not prejudiced by the Response because the Court gave it an opportunity to file a Re-

---

**8.** The Court is aware that its ruling with respect to the Engines and the Records will impair TIMCO's ability to recover fair market value of the Aircraft at a judicially ordered sale. However, such facts should be taken into consideration by TIMCO when it determines whether it wishes to proceed with its request for the Court to order a sale pursuant to N.C. Gen.Stat. § 44A–4.

ply, so that TIMCO could fully support its opposition to AIB's position on the Treaty. For all of the foregoing reasons, the Court, in its discretion, DENIES TIMCO's motion to disregard AIB's Response, in that doing so would serve no useful purpose at this point.

## II. CONCLUSION

For the reasons stated above, TIMCO's Motion for Judicial Hearing, and for Order to Conduct Sale [Document # 8] is DE-NIED, to the extent that TIMCO seeks, as part of the motion, the return of the Engines and the Records. The motion is also DENIED to the extent that TIMCO bases said motion on the untimeliness of AIB's Response. To the extent that TIMCO seeks, as part of its motion, an order to conduct a judicial sale, pursuant to N.C. Gen.Stat. § 44A–4, the Court's ruling on this matter will be held in abeyance to await clarification from TIMCO as to whether an order to conduct a judicial sale is still being requested. An ORDER consistent with this MEMORANDUM OPINION shall be filed contemporaneously herewith.

## ORDER

For the reasons stated in the MEMORANDUM OPINION filed contemporaneously herewith,

IT IS HEREBY ORDERED that TIMCO's Motion for Judicial Hearing, and for Order to Conduct Sale [Document # 8] is DENIED, to the extent that TIMCO seeks, as part of the motion, the return of the Engines and the Records.

IT IS FURTHER ORDERED that the motion is DENIED to the extent that TIMCO bases said motion on the untimeliness of AIB's Response.

IT IS FURTHER ORDERED that, to the extent that TIMCO seeks, as part of its motion, an order to conduct a judicial

sale pursuant to N.C. Gen.Stat. § 44A–4, the Court's ruling on this matter will be held in abeyance to await clarification from TIMCO as to whether an order to conduct a judicial sale is still desired.